# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARY GRACE LAURICH,

      Plaintiff,

vs.                                           No. CIV 17-0150 JB/KRS

RED LOBSTER RESTAURANTS, LLC,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Compel Arbitration, filed March 2, 2017 (Doc. 5)("Motion").  The Court held a hearing on July 12, 2017.  The primary issues are: (i) whether the parties' Arbitration Agreement is illusory, which depends on whether Defendant Red Lobster Restaurants, LLC ("Red Lobster") provided consideration; (ii) whether asking Plaintiff Mary Grace Laurich to sign the 2014 Dispute Resolution Process Acknowledgment, filed March 2, 2017 (Doc. 5-2)("2014 Agreement") during a work shift makes the Arbitration Agreement procedurally unconscionable; and whether (iii) Red Lobster breached the Arbitration Agreement in such a way that precludes it from enforcing the Arbitration Agreement.  The Court concludes that: (i) the Arbitration Agreement is not illusory, because both parties provided consideration; (ii) the Arbitration Agreement is not unconscionable, because Laurich was not deprived of meaningful choice to enter the arbitration agreement; and (iii) whether Red Lobster breached the Arbitration Agreement in such a way that precludes it from enforcing the Arbitration Agreement is a question for the arbitrator and not for the Court.  Accordingly, the Court grants the Motion, and stays the proceeding pending the arbitration's resolution.

## FACTUAL BACKGROUND

The Court draws its facts from Laurich's Complaint for Violation of Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act, Wrongful Discharge and Negligent Hiring and Supervision, filed February 2, 2017 (Doc. 1)("Complaint"), from the Plaintiff's Response to Defendant's Motion to Compel Arbitration ¶ 1, at 2, filed March 16, 2017 (Doc. 9) ("Response"), and from the Motion hearing, Draft Hearing Transcript, taken July 12, 2017 ("Tr.").[1]  The Court recites Laurich's version of the facts not out of any predisposition to believe her side of the story, but to establish a cogent, internally consistent version of events for its analysis.  Moreover, Red Lobster stated, at the Motion hearing, that the Court may assume Laurich's version of events to be correct when deciding the Motion, because Laurich's account allegedly supports Red Lobster's position.  See Tr. at 4:21-5:10 (Court, Lamont).

Laurich began working as a server at a Red Lobster restaurant in Albuquerque, New Mexico in 2008.  See Complaint ¶ 11, at 2; Response ¶ 1, at 2.  In 2014, Red Lobster purchased the Red Lobster restaurant chain -- which included the Albuquerque Red Lobster restaurant -- from GMRI, Inc.  See Response ¶ 2, at 2.  Around that time, Laurich was working a shift when one of her managers instructed Laurich to "review a lengthy employment agreement on a computer terminal."  Response ¶¶ 4-5, at 3.  Laurich asked for a hard copy to review, but "was told that none were available."  Response ¶ 4, at 3.  The manager told her that, if she did not sign the electronic document, "she would be taken off the work schedule."  Response ¶ 5, at 3.  Laurich then "registered her initials on the computer terminal" and returned to work. Response ¶ 6, at 3.  The employment documents which Laurich electronically signed included a provision stating that both she and Red Lobster would be subject to Red Lobster's Dispute

---

[1]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Resolution Process.  See Response at 6; Motion at 3; 2014 Agreement at 1; Dispute Resolution

Process, filed March 2, 2017 (Doc. 5-3)("DRP").

Starting in July, 2016, a Red Lobster cook named Willie Prather "began harassing

[Laurich] based on her race and sex," Complaint ¶ 15, at 2, calling her names like "fat bitch" and

"white bitch," and making threatening statements, Complaint ¶¶ 16-17, at 2-3.  Laurich

complained to management about Prather, but they "did nothing to address Mr. Prather's

behavior or Plaintiff's work environment."  Complaint ¶ 21, at 3.  Laurich asserts that, on or

about August 5, 2016, Prather "continued to harass her verbally" and intentionally gave her

incorrect orders to serve to customers.  Complaint ¶ 23, at 3.  Laurich alleges that, after Laurich

complained about Prather's actions, Prather "accused her of 'snitching' to the manager, and told

her that 'snitches get stiches'" and then "shoved [Laurich] into a shelf."  Complaint ¶ 25, at 3.

Laurich was, at the time, about seven-and-a-half months pregnant.  See Complaint ¶ 12, at 2.

After Prather shoved Laurich, a manager intervened and told Laurich to wait outside the

restaurant, near the restaurant's entrance, while, Laurich asserts, "[u]pon information and belief,

the manager took Mr. Prather into an office."  Complaint ¶ 26, at 3.  While standing outside the

restaurant, Laurich used her cellular telephone to call her boyfriend.  See Complaint ¶ 27, at 3.

Laurich alleges that, while she was on her cellular telephone, "Mr. Prather then emerged from

the restaurant, incorrectly assumed that Plaintiff was using the cellphone to call the police, and

punched Plaintiff in the face, knocking the cell phone out of her hand.  Mr. Prather took the

Plaintiff's phone and ran away."  Complaint ¶ 27, at 3.  Afterwards, Laurich told Red Lobster

that she "was not comfortable returning to work unless she could be assured that Mr. Prather

would not be there."  Complaint ¶ 28, at 4.  Laurich asserts that, "[w]hile waiting and hoping that

a reasonable accommodation could be made, [Laurich] learned that she had been terminated by Defendant."  Complaint ¶ 30, at 4.

## PROCEDURAL BACKGROUND

Laurich filed her Complaint on February 2, 2017.  First, Laurich asserts that Red Lobster violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), by subjecting her to "a hostile working environment as a result of discrimination based on her sex and race."  Complaint ¶ 37, at 5.  Laurich asserts that Red Lobster either "knew or should have known" of Prather's history of violence, including violence against women, and had received "numerous complaints of [Prather's] threats and harassment from multiple female employees." Complaint ¶ 44, at 5.  Despite this knowledge, Laurich asserts, Red Lobster "did nothing to remedy an obviously dangerous situation," and "made no good-faith effort to remedy the hostile working environment or to protect its female employees, or to otherwise comply with the requirements of Title VII."  Complaint ¶ 44-45, at 5.  Laurich also contends that Red Lobster's decision to terminate her employment "was discriminatory and based on her sex and race," and her "late state of pregnancy," as Red Lobster knew she was "about take maternity leave." Complaint ¶ 46, at 5.  Laurich contends, in summary, that Red Lobster "acted intentionally, willfully and with reckless disregard and deliberate indifference to [her] safety and well being." Complaint ¶ 48, at 6.

Second, Laurich asserts that Red Lobster's actions violate the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-1 et seq.  See Complaint ¶¶ 50-63, at 6-7.  In support of this count, Laurich proffers the same allegations made in support of her Title VII claim.  See Complaint ¶¶ 50-63, at 6-7.

Third, Laurich alleges that Red Lobster was negligent in hiring and supervising its employees.  See Complaint ¶¶ 64-72, at 7-8.  She argues that Red Lobster had a duty to exercise reasonable care for its employees' safety, and Red Lobster breached that duty by hiring and continuing to employ Prather "despite his criminal record, history of violence, history of violence toward women, and continued threats and acts of violence toward women during his employment."  Complaint ¶¶ 65-66, at 7.  Laurich asserts that, as a result of Red Lobster's negligence, she "was harassed and physically battered by Mr. Prather while she was at work."  Complaint ¶ 67, at 8.  Laurich also contends that Red Lobster is vicariously liable for Prather's actions, because, by "refus[ing] to address multiple complaints by multiple female employees," Red Lobster "implicitly and tacitly authorized and ratified Mr. Prather's behavior."  Complaint ¶¶ 71-72, at 8.

Finally, Laurich asserts that she was wrongfully discharged.  See Complaint ¶¶ 73-76, at 8.  She argues that Red Lobster terminated her employment for reasons "contrary to public policy," because Red Lobster terminated her employment "based on her race, sex and pregnancy," and "in retaliation for her repeated complaints of harassment and/or pregnancy."  Complaint ¶ 74, at 8.

**1.      Motion to Compel Arbitration.**

Red Lobster moves to compel arbitration and requests that the Court "stay this proceeding pending resolution of the arbitration."  Motion at 1.  Red Lobster contends that Laurich's "claims are barred from this proceeding in this Court by a binding arbitration agreement" covered by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA").  Motion at 2. First, Red Lobster asserts that, when Laurich applied for a job at the Red Lobster restaurant on August 11, 2008 -- then owned by a different company, GMRI, Inc. -- she signed and submitted

application form which featured the following provision:

> I UNDERSTAND THAT GMRI, INC. D/B/A RED LOBSTER HAS IN PLACE A DISPUTE RESOLUTION PROCEDURE, AND I FURTHER ACKNOWLEDGE AND AGREE THAT IF I AM OFFERED AND ACCEPT EMPLOYMENT, ANY DISPUTE BETWEEN ME AND GMRI, INC., RELATING TO MY EMPLOYMENT AND/OR MY SEPARATION FROM EMPLOYMENT, SHALL BE SUBMITTED WITHIN ONE (1) YEAR OF THE DAY WHICH I LEARNED OF THE EVENT AND SHALL BE RESOLVED PURSUANT TO THE TERMS AND CONDITIONS OF THE DISPUTE RESOLUTION PROCEDURE.

Motion at 2 (quoting Laurich Application Form at 2, filed March 2, 2017 (Doc. 5-1)).  Red Lobster then asserts that Laurich, when she was hired, signed a "Dispute Resolution Process Acknowledgment" form, which read:

> I agree as a condition of my employment, to submit any eligible disputes I may have to the company's DRP and to abide by the provisions outlined in the DRP. I understand that his includes, for example, claims under state and federal laws relating to harassment or discrimination, as well as other employment-related claims as defined by the DRP. Finally, I understand that the company is equally bound to all of the provisions of the DRP.

Motion at 2 (quoting 2008 Dispute Resolution Process Acknowledgment at 1, filed March 2, 2017 (Doc. 5-2)("2008 Agreement")).  Red Lobster contends that Laurich "again acknowledged the DRP as a condition of continued employment" when GRMI, Inc. "sold its Red Lobster business in 2014" to Red Lobster.  Motion at 3.  That acknowledgment reads:

> I agree as a condition of my employment, to submit any eligible disputes I may have to the DRP and to abide by the provisions outlined in the DRP. I understand this includes, for example, claims under state and federal laws relating to harassment or discrimination, as well as other employment related claims as defined by the DRO. Finally, the Company is equally bound to all of the provisions of the DRP.

Motion at 3 (quoting 2014 Agreement).  Red Lobster asserts that "[t]he Acknowledgments drew [Laurich's] attention to the DRP"; when Laurich "signed the Acknowledgments[,] . . . [she] acknowledged that she had reviewed and agreed to abide by the DRP."  Motion at 3.

Red Lobster asserts that the "DRP contains various steps, with arbitration identified as the final step."  Motion at 3.  Red Lobster contends that the DRP "expressly states that employees cannot pursue covered claims in court."  Motion at 3.  The DRP reads: "The DRP, instead of court actions, is the sole means for resolving covered employment-related disputes. Disputes eligible for DRP must be resolved only through DRP, with the final step being binding arbitration heard by an arbitrator. This means DRP-eligible disputes will not be resolved by a judge or a jury."  Motion at 3 (quoting DRP at 1).  Red Lobster contends that the DRP applies to Laurich's claims.  See Motion at 3.

Next, Red Lobster argues that the FAA applies to the DRP, and, therefore, Laurich must arbitrate her claims.  See Motion at 4.  Red Lobster asserts that the FAA "provides that any 'written provision in . . . a contract evidencing a transaction involving commerce'" to settle a controversy arising out of the contract or transaction through arbitration is valid unless the contract is revocable on some legal or equitable ground.  Motion at 4 (quoting 9 U.S.C. § 2). Red Lobster asserts that the FAA covers Laurich's claims, because the term "involving commerce" is interpreted broadly, covering "any arbitration agreement that affects commerce in any way."  Motion at 4 (citing Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270-77 (1995)).  Red Lobster also argues that the FAA, and not state law, applies to Laurich's claims, because state law will exclusively apply only if the agreement clearly says state law applies, see Motion at 4 (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63-64 (1995)), and the DRP expressly says that the FAA governs, see Motion at 4 (citing DRP at 6).

Red Lobster also argues that the FAA applies to the DRP, because the DRP "affects commerce": with "roughly 700 locations across the United States," Red Lobster "necessarily affects and involves interstate commerce."  Motion at 4 (citing Citizens Bank v. Alafabco, Inc.,

539 U.S. 52, 58 (2003); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. at 282). Red Lobster

also contends that the FAA "creates a general presumption in favor of arbitration." Motion at 5

(citing 9 U.S.C. § 2; Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991)). Red

Lobster asserts that the FAA "restricts a court's inquiry related to compelling arbitration to two

threshold questions: (1) whether there is a valid agreement to arbitrate; (2) whether the

agreement covers the dispute." Motion at 5 (citing Howsam v. Dean Witter Reynolds, Inc., 537

U.S. 79, 83-84 (2002)).

Next, Red Lobster argues that a valid agreement to arbitrate binds Laurich. See Motion

at 5-6. Red Lobster asserts that, under the FAA, a valid arbitration agreement does not require

that the parties sign a document. See Motion at 5 (citing AT&T Mobility LLC v. Conception,

131 S. Ct. 1740, 1747 (2011)). Red Lobster contends that

> [Laurich] manifested assent to the DRP through both execution of the application
> and acknowledgments that compliance with the DRP was a condition of her initial
> employment, as well as through her continued employment with Red Lobster.
> Plaintiff explicitly certified that she understood that acceptance of the DRP was a
> condition and term of her employment even *before* Red Lobster hired her.

Motion at 5 (emphasis in original).

Red Lobster then argues that state law applies when considering whether parties form a

contract, see Motion at 5-6 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944

(1995)), and that, in New Mexico, each party to a contract has a duty to read the contract's

content, and both sides must provide consideration, see Motion at 6 (citing Ballard v. Chavez,

1994-NMSC-007, ¶ 8, 868 P.2d 646, 648; Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 9, 80

P.3d 495, 498). Red Lobster contends that the DRP has sufficient consideration, because it

"imposes mutual obligations to arbitrate" as a condition of Laurich's employment. Motion at 6.

Finally, Red Lobster argues that the DRP covers Laurich's claims, because the DRP

"applies to any dispute concerning the employment, reemployment or application for employment by an employee."   Motion at 6-7 (citing DRP at 1).   Red Lobster concludes by asking the Court "to enter an Order compelling [Laurich] to arbitrate her claims against Red Lobster and staying this action during the pendency of the arbitration."  Motion at 7.

2.      **The Response.**

Laurich responds in the Plaintiff's Response to Defendant's Motion to Compel Arbitration at 1, filed March 16, 2017 (Doc. 9)("Response").  Laurich begins by arguing that the arbitration clause is unconscionable.  See Response at 1.  Laurich argues that the FAA applies only when there is an arbitration agreement, and that the "'presumption in favor of arbitration . . . disappears'" when the parties dispute the arbitration agreement's validity or existence.  Response at 2 (quoting Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, No. CIV 05-1331, 2006 WL 4061187, at *5 (D.N.M. 2006)(Browning, J.)).  Laurich argues that a court should apply state law principles of contract formation, and that, under New Mexico law, an arbitration clause "may be unenforceable if it is either substantively or procedurally unconscionable." Response at 2 (citing Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 24, 208 P.3d 901, 908). This analysis, Laurich asserts, involves considering the "particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline the terms demanded by the other."   Response at 2 (quoting Cordova v. World Fin. Corp., 2009-NMSC-021, ¶¶ 23-24, 208 P.3d at 907-08).

Laurich next asserts that she began working at Red Lobster in 2008.  See Response at 2. In 2014, when Red Lobster took ownership from GMRI, Inc., Laurich asserts that she and her coworkers "were told that they were required to sign some new documents."  Response at 2-3.

- 9 -

Laurich avers that, during a shift, "when she was expected to continue serving her customers and perform her other usual tasks, [she] was instructed to review a lengthy employment agreement on a computer terminal." Response at 3. Laurich states that she asked to review a hard copy, but "was told that there were none available." Response at 3. Laurich asserts that she stated that, "if she did not sign the electronic document, she would be taken off the work schedule." Response at 3. Laurich states that she then "registered her initials on the computer so she could return to her shift and her customers." Response at 3. Laurich asserts that, under those circumstances, she was "not given a reasonable opportunity to read the new employment agreement," and was "simply told that she would not be allowed to work if she did not sign it." Response at 3. She contends that she was "at a disadvantage" as she was mid-shift and had customers waiting, and "she relies largely on tips to make her living." Response at 3.

Next, Laurich argues that the 2014 Agreement is "[i]llusory and [u]nenforceable." Response at 3. She argues that her case is similar to Dumas v. American Golf Corp., 150 F. Supp. 2d 1182 (D.N.M. 2001)(Vazquez, J.), where the court concluded that "an arbitration agreement that was signed a few months after employment began was unenforceable for lack of consideration." Response at 4 (citing Dumas v. American Golf Corp., 150 F. Supp. 2d at 1193-94). Laurich asserts that her situation is comparable to Dumas v. American Golf Corp. given that Red Lobster seeks to enforce an arbitration agreement "first presented to [Laurich] approximately six years after she had begun her employment." Response at 4. Laurich then notes that Red Lobster's argument that in the arbitration agreement's consideration was her continued employment, and argues that the Court of Appeals of New Mexico rejected a similar argument in Piano v. Premier Distributing Co., 2005-NMCA-018, 107 P.3d 11. Response at 4 (citing Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, No. CIV 05-1331, 2006

WL 4061187, at *7 ("The Court of Appeals, in <u>Piano v. Premier Distributing Company</u>, rejected the employer's argument that continued at-will employment and the reciprocal promise to arbitrate were sufficient consideration to sustain the agreement.")).

Next, Laurich contends that Red Lobster cannot enforce the DRP because it has already violated the DRP.  <u>See</u> Response at 4-6.  Laurich asserts that the DRP holds that the first step in dispute resolution is to bring one's concerns to a manager, which will prompt an "'open and honest exchange by the people who are closest to the problem.'"  Response at 4 (quoting DRP at 4).  Laurich asserts that, although she was "unaware of the existence" of the DRP, she "unwittingly followed the first step" by bringing her concerns to management on multiple occasions.  Response at 4-5.  Laurich explains:

> After getting no feedback or assistance from management, she submitted a verbal complaint to the general manager of the restaurant, who summarily dismissed [Laurich's] concerns, but instructed her to submit a written statement.  [Laurich] did submit a written statement on July 28, 2016 and never received any response to that complaint. . . .   At no time during [Laurich's] employment did any manager or representative of [Red Lobster] tell her that she should move on to the second step of the DRP, a peer review.

Response at 5 (citations omitted)(citing Complaint ¶¶ 10-17, at 2-3).  Laurich argues that Red Lobster's failure to follow the DRP precludes it from enforcing the DRP because a "basic principle of contract law is that a party cannot enforce a contract after that party has breached the contract."  Response at 5 (citing <u>KidsKare, P.C. v. Mann</u>, 2015-NMCA-064, ¶ 20, 350 P.3d 1228, 1234).

**3.    <u>The Reply</u>.**

Red Lobster replied on April 6, 2017.  <u>See</u> Reply in Support of Motion to Compel Arbitration, filed April 6, 2017 (Doc. 13)("Reply").  Red Lobster states that Laurich did not agree to the 2014 Agreement under duress, because she had been working under an arbitration

agreement ever since she began working at the restaurant, when GMRI owned the Red Lobster restaurant  See Reply at 3.  Red Lobster contends that Laurich "should not have been surprised by her new employer's requirement that she agree to its DRP, which is modeled on and almost identical to that of" GMRI, Inc.'s arbitration agreement.  Reply at 3.

Red Lobster then argues that Laurich's account "of the circumstances under which she acknowledged [Red Lobster's] DRP defies logic."  Reply at 3.  Red Lobster asserts that it "would never require [Laurich] to acknowledge the DRP or any other policy while she simultaneously waited on customers at her tables," because that would be "contrary to [Red Lobster's] good business practices and could adversely impact customers' dining experiences." Reply at 3.  Rather, Red Lobster asserts that, when employees "must review and acknowledge new policies," it "requires them to do so either before or after their shift, while on the clock." Reply at 3.  Red Lobster asserts that its manager, Willie Stewart, has "no recollection of telling any employee, including [Laurich], to review policies while working a regular shift."  Reply at 4 (citing Declaration of Willie Stewart ¶ 8, at 1, filed April 6, 2017 (Doc. 13-2)).

Next, Red Lobster contends that the DRP is not illusory.  See Reply at 4.  Red Lobster argues that Laurich's reliance on Dumas v. American Golf Corp., Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, and Piano v. Premier Distributing Co. is "misplaced" because Red Lobster asked her to sign an arbitration agreement when it took over the restaurant, in 2014.  Reply at 4.  Red Lobster argues that, although Laurich "continued to work at the same [r]estaurant, she had a new employer who required her to agree to the DRP as a condition of her new, not her continued, employment."  Reply at 4.

Finally, Red Lobster contends that it did not violate the DRP.  See Reply at 4-5.  Red Lobster asserts that Laurich "did not raise concerns about harassment to Red Lobster"; rather,

"[s]he had a dispute regarding a loan to a co-worker and complaints about her customers' plates not being properly dressed with condiments," which she put into writing.  Reply at 5 (citing Declaration of Deborah Hochsprung ¶ 8, at 2 (dated April 6, 2017) (Doc. 13-1)("Hochsprung Decl.").  Red Lobster asserts that Hochsprung investigated the complaints, but "could not substantiate" them.  Reply at 5 (citing Hochsprung Decl. ¶ 9 at 2).  Nonetheless, Red Lobster contends, Hochsprung "reminded the kitchen staff, including Willie Prather, of the importance of properly dressing plates."  Reply at 5 (citing Hochsprung Decl. ¶ 10, at 2).  Red Lobster does not state whether it informed Laurich of DRP's second and third steps.  See Reply at 5.

Red Lobster contends that, in any case, the question whether it breached the DRP is immaterial to the question at hand -- whether there is a valid arbitration agreement.  See Reply at 4.

### 4.      **The Hearing**.

The Court held a hearing on July 12, 2017.  See Tr. at 1.  Red Lobster began by stating that the "limited issues before the Court [are] whether there is a valid arbitration agreement and . . . whether [Laurich's] claims are covered by the agreement."  Tr. at 2:17-20 (Lamont).  Red Lobster stated that Laurich has not argued that the agreement does not cover the claims.  See Tr. at 2:21-22 (Lamont).  Rather, Red Lobster summarizes Laurich's position as comprising three arguments: (i) that the arbitration agreement is illusory, because there is no consideration; (ii) that the arbitration agreement is unconscionable, because Laurich did not have adequate time to review its terms; and (iii) that Red Lobster cannot enforce the arbitration agreement, because it did not follow the DRP.  See Tr. at 2:22-3:7 (Lamont).  Red Lobster addressed the first argument -- that the arbitration agreement is illusory -- and asserted that Laurich worked for six years at the Red Lobster restaurant when it was owned by GMRI, Inc., and was subject to a

dispute resolution process that is "very, very similar" to Red Lobster's DRP.  Tr. at 3:10-23 (Lamont).  Red Lobster explained that, when it acquired the Red Lobster restaurant chain from GMRI, Inc., and "as part of its consideration to hire Ms. Laurich as an employee to this new corporation," Red Lobster required Laurich to agree to Red Lobster's DRP.  Tr. at 3:24-4:7 (Lamont).  Red Lobster then asserted that Laurich's account of how her restaurant manager asked her to agree to the DRP -- i.e., "requiring her to review employment documents while waiting tables" -- "defies logic if you've been a diner or server in a restaurant" given that "the last thing the management wants is for you to divert your attention from the guests."  Tr. at 4:8-15 (Lamont).  Red Lobster added that, although Laurich says she was denied a paper copy of the agreement, "[s]he doesn't contend that she wasn't allowed to review it on the computer if she wanted to."  Tr. at 4:15-18 (Lamont).

The Court interjected, asking whether, for the purposes of the Motion, it should "go ahead and assume the plaintiff's version of events."  Tr. at 4:21-23 (Court).  Red Lobster replied that, "for the purposes of this case, you can," because Laurich's affidavit and pleadings "actually support the argument that she was about to be employed by a new employer, and that the consideration for her to stay on the schedule and to be employed by the new employer was to execute a DRP."  Tr. at 5:4-10 (Lamont).

The Court then asked Red Lobster whether Laurich's "illusory argument is also the procedural unconscionability argument," and Red Lobster replied that "I think it all wraps together."  Tr. at 6:5-11 (Court, Lamont).

The Court then gave Laurich an opportunity to discuss the illusory agreement argument.  See Tr. at 6:17 (Court).  Laurich disputed that an ownership change means that Laurich began a new job, asserting that "there [was] no new paperwork for a new job, and there [was] no new

application."   Tr. at 6:19-25 (Bregman).   The Court asked, "if you've got an at-will arrangement . . . , what would be wrong with them saying, 'Ms. Laurich, if you don't sign this, you're going home right now'?"   Tr. at 7:1-4 (Court).   Laurich responded that, in this case, Red Lobster did not simply require Laurich to sign the arbitration agreement; they told her that she had to sign the agreement during a work shift, and it is not clear that anyone told Laurich that she had to sign the new agreement because of the ownership change.   See Tr. at 7:12-8:1 (Bregman).

Laurich then stated: "I don't think you can sign off on arbitration without having a proper time to review the document," especially considering Laurich requested a hard copy but was not given one.   Tr. at 9:3-9 (Bregman).   The Court stated that it did not understand why not being given a hard copy would invalidate a contract or make it illusory.   See Tr. at 9:10-16 (Court).   Laurich replied that the circumstances made it illusory:

> [If Red Lobster is] not giving her a fair opportunity to read it, what's her choice? . . . [I]gnore all my tables out there and . . . read [the entire document or] wait on the people that are sitting waiting on dinner?   That's not a very good choice for her, and they put her in that situation. . . .   [I]t's almost signing under duress because if she doesn't do it, she's going to have a lot of people mad at her out there and she's not going to make the same kind of money tips-wise if she's ignoring her customers while at the same time she's being required to sign off on a legal document . . . .

Tr. at 9:7-10:20 (Bregman).

Next, the Court asked Laurich about Red Lobster's argument that "she's better off than most people who sign arbitration agreements because she'd worked there for six years," and knew that "she had signed arbitration agreements before and was signing them again."   Tr. at 13:4-10 (Court).   Laurich stated that she does not agree with the Court's characterization, stating that "I think that's a slippery slope" to presume someone has knowledge of an agreement based on past agreements.   Tr. at 13:22-14:7 (Bregman).

The Court asked whether Laurich agreed that the "illusory argument is also the same as

your procedural unconscionability argument [ -- that they] are one and the same."  Tr. at 14:8-10 (Court).  Laurich agreed that they were the same arguments.  See Tr. at 14:11 (Bregman).

The Court then asked Red Lobster whether it had more thoughts to share on the illusory agreement and procedural unconscionability issues.  See Tr. at 14:17-18 (Court).  Red Lobster noted that Laurich's employment ended in August, 2016, "two years after she electronically acknowledged the arbitration agreement."  Tr. at 15:5-7 (Lamont).  Red Lobster contended that "two years is plenty of time . . . to get on the computer, ask a question, say I don't want to be bound by this, and it was not even brought up . . . until after [Laurich] had filed suit."  Tr. at 7-13 (Lamont).

The Court asked what would happen if it grants the Motion.  See Tr. at 45:23-16:1 (Court).  Red Lobster stated that the parties would go straight to the American Arbitration Association ("AAA"), and that Laurich would make the AAA filing.  See Tr. at 16:2-24 (Lamont).

The Court then switched gears to whether Red Lobster violated its DRP policies.  See Tr. at 17:1-4 (Court).  Red Lobster stated that Laurich had the burden to initiate the DRP's peer review process, but she did not do so.  See Tr. at 17:7-9 (Lamont).  Red Lobster asserted that it "would not in and of itself say, well, maybe we better have a peer review process of our decision to terminate this employee who never returned to work."  Tr. at 17:9-12 (Lamont).

Laurich then returned to the podium and asserted that arbitration would be very expensive -- ranging from about $7,000.00 to $20,000.00 -- and Laurich is unemployed.  See Tr. at 18:10-13 (Bregman).  Red Lobster asserted that AAA procedures hold that the company pays the fees.  See Tr. at 18:16-25 (Court, Lamont).  Laurich argued that Red Lobster "breach[ed] the contract" when it failed to respond to Laurich's verbal and written complaints, pursuant to the

DRP's first step.[2]  Tr. at 19:4-23 (Bregman)(referencing DRP at 4) .  Laurich asserted that the

party that breaches the contract should not be allowed to enforce it.  See Tr. at 19:20-23

(Bregman).  The Court expressed its concern that, if a company cannot enforce an arbitration

agreement when it does not first follow its policies meant to resolve disputes before they reach

arbitration, then the Court would be put in "a difficult position of determining some merits

issues" before deciding whether the arbitration clause applies.  Tr. at 19:24-20:10 (Court).

Laurich responded that she understands the Court's concern, but stated that those policies "are

part of the arbitration process itself . . . [and] if they breach step one, then how do we get to step

four if they're required to do step one?"  Tr. at 20:11-19 (Bregman).  The Court asked whether

Laurich alleged any claims relating to a breach of an employment contract, and Laurich said she

was not bringing such a claim.  See Tr. at 20:20-21:2 (Court, Bregman).  The Court asked

whether the steps leading to mediation "are more policies than they are contracts," and Laurich

replied that they are part of a contract, "because that's how arbitration clauses have been

continually analyzed throughout the state courts in New Mexico."  Tr. at 21:3-10 (Court,

Bregman).  Laurich added: "The overall issue [in this case] may not arise under an employment

contract, but the arbitration is a contract between the employer and the employee."  Tr. at

21:13-17 (Bregman).  The Court stated that "I thought New Mexico and the federal courts had

made a distinction between policies and contracts," such that "a company could have a whole

bunch of policies but [they are not] contractual for purposes of an employment contract."  Tr. at

---

[2]The DRP's first step is the "Open Door" step:

> If the Employee has a workplace concern of dispute, the Employee should bring it
> to the attention of the Employee's manager. . . . Open Door allows for an open
> and honest exchange by the people who are closest to the problem and often
> provides the best insight and opportunity for mutual resolution.

DRP at 4.

21:18-25 (Court).  Laurich replied that "common sense tells me if it's just a policy, why are they having the employees sign off on it [unless] it's a contract?"  Tr. at 22:5-8 (Bregman).

Red Lobster took to the podium and argued that the steps outlined in the DRP are not mandatory: step one -- the open door step -- "says that if the employee has a workplace concern or dispute, employee should bring it to the attention of his manager -- should."  Tr. at 23:21-25 (Lamont).  Red Lobster continued: "[T]he first two steps are not musts."  Tr. at 24:3-4 (Lamont). The Court asked whether there is anything "that binds the company in any way," and Red Lobster answered that there was not anything that bound the company, "but the company has to participate if the employee initiates the peer review process."  Tr. at 24:10-15 (Court, Lamont). Red Lobster discusses the DRP's other steps, noting that "it says that if either party doesn't like the outcome of the peer review they can request mediation," and, if a party is not satisfied with mediation, "that party must demand arbitration."  Tr. at 24:12-25:6 (Court, Lamont).  Red Lobster notes that step four is the first time the word "must" is used, i.e., it is "the first time it's no longer permissive."  Tr. at 25:7-10 (Court, Lamont).  Red Lobster summarized the process:

> The Employee can do open door and peer review, and if they're dissatisfied, they can mediate, but if they wanted a final binding decision, they must request arbitration, for which it says right in the agreement that the company will pay all the costs.  So there is no downside to this for Ms. Laurich, in terms of cost.

Tr. at 25:14-20 (Lamont).

The Court then asked Laurich whether there is any dispute that her claims are within the arbitration agreement's purview, and Laurich replied that there was no dispute on that issue.  See Tr. at 26:1-4 (Court, Bregman).

The Court then stated:  "I'm inclined to think that it's not illusory.  Even taking the facts as the plaintiff has stated them, . . . she knew what she was signing and . . . they are binding

against her and . . . there is no unconscionability in enforcing it. . . . So I'm inclined to grant the motion to arbitrate . . . ."  Tr. at 26:11-21 (Court).

**LAW REGARDING ARBITRATION AGREEMENTS**

An arbitration agreement is a contract or a provision in a contract whereby parties agree to "settle by arbitration a controversy . . . arising out of such contract or transaction." 9 U.S.C. § 2.  Both federal and New Mexico law reflect a public policy in favor of arbitration agreements.  See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994)("There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."); United Tech. & Res., Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d 307, 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'")(quoting Dairyland Ins. Co. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d 281, 284).  To be enforceable, an arbitration agreement must be validly formed pursuant to state contract law principles -- e.g., the arbitration agreement must not be illusory or unconscionable.  See Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 ("To determine whether the agreement to arbitrate is valid, courts look to general state contract law . . . .").

1.      **Federal law.**

"The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010).  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."  Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 67-68 (internal citations omitted).

Under § 4 of the FAA, a party "aggrieved" by another party's failure "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If one party's refusal to arbitrate under a written agreement aggrieves another party, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.  Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 64.

Upon a finding that a matter is referable to arbitration, the FAA also indicates that the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3. Notwithstanding 9 U.S.C. § 3's terms, however, several Courts of Appeal have concluded that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001). See Green v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000)("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be

submitted to arbitration."); <u>Bercovitch v. Baldwin Sch., Inc.</u>, 133 F.3d 141, 156 n.21 (1st Cir. 1998); <u>Alford v. Dean Witter Reynolds, Inc.</u>, 975 F.2d 1161, 1164 (5th Cir. 1992); <u>Sparling v. Hoffman Constr. Co.</u>, 864 F.2d 635, 638 (9th Cir. 1988).

The United States Court of Appeals for the Tenth Circuit has cautioned that, when one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3's mandatory language is binding, and it is error for the court to dismiss the action. <u>See Adair Bus Sales, Inc. v. Blue Bird Corp.</u>, 25 F.3d 953, 955 (10th Cir. 1994). When, however, the party seeking to compel arbitration requests the court for dismissal, and there is no evidence in the record of any party requesting a stay, it is not error for the district court to dismiss the case. <u>See Armijo v. Prudential Ins. Co. of Am.</u>, 72 F.3d 793, 797 (10th Cir. 1995); <u>Cornoyer v. AT&T Mobility Servs., LLC</u>, No. CIV 15-0474, 2016 WL 6404853, at *7-8 (D.N.M. Oct. 5, 2016)(Browning, J.); <u>Thompson v. THI of New Mexico at Casa Arena Blanca, LLC</u>, No. CIV 05-1331, 2006 WL 4061187, at *16 (D.N.M. Sept. 12, 2006)(Browning, J.)(dismissing a case where the plaintiff neither requested a stay nor argued that some claims may not be arbitrable).

### 2. **New Mexico Law.**

New Mexico's Uniform Arbitration Act, N.M. Stat. Ann. § 44-7A-1 <u>et seq.</u> ("NMUAA") provides that an agreement to submit any controversy arising between the parties to arbitration is "valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." N.M. Stat. Ann. § 44-7A-7(a). If the court concludes that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate. <u>See</u> N.M. Stat. Ann. § 44-7A-8(a). Where the provision for arbitration is disputed, the court's function is to determine whether there is an agreement to arbitrate and to order arbitration where an agreement is found. <u>See</u> N.M. Stat. Ann. § 44-7A-8(a).

Similar to the federal courts' interpretation of the FAA, New Mexico courts have viewed the NMUAA as an expression of a public policy favoring arbitration. See United Tech. & Res., Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d at 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'")(quoting Dairyland Ins. Co. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d at 284). More specifically, New Mexico courts have construed the Act's legislative purpose as an attempt to reduce the court's caseload. See Bd. of Educ. Taos Mun. Sch. v. Architects, Taos, 1985-NMSC-102, ¶ 10, 709 P.2d 184, 186 ("A concern for preserving scarce judicial resources lies at the heart of the preference for arbitration."); Dairyland Ins. Co. v. Rose, 1979-NMSC-021, ¶ 19, 591 P.2d at 285 (concluding that "the legislative intent in enacting the [NMUAA], and the policy of the courts in enforcing it, is to reduce caseloads in the courts, not only by allowing arbitration, but also by requiring controversies to be resolved by arbitration where contracts or other documents so provide").  In New Mexico, when the court finds that an arbitration agreement exists and is valid, then, in accordance with the NMUAA, the court has a duty to enforce the agreement's provisions and order adherence to that arbitration agreement.  See Bernalillo Cty. Med. Ctr. Emps' Ass'n Local 2370 v. Cancelosi, 1978-NMSC-086, ¶¶ 4-5, 587 P.2d 960, 961. Consistent with this understanding, the Supreme Court of New Mexico has interpreted the NMUAA to limit the court's role to determining if an arbitration agreement exists and, if so, to order the parties to arbitration:

> When a broad and general arbitration clause is used, as in this case, the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed. When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters. Barring such limiting language, the courts only decide the threshold question of whether there is an

agreement to arbitrate. If so, the court should order arbitration. If not, arbitration should be refused.

K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d 752, 754. Accordingly, in New Mexico, parties entering a contract providing for the resolution of disputes through arbitration are bound by their agreement to arbitrate. See Christmas v. Cimarron Realty Co., 1982-NMSC-079, ¶¶ 7-10, 648 P.2d 788, 790.

### 3.   Public Policy Favoring Enforcement of an Arbitration Agreement.

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d at 1488-89. See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Americas Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24).   Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Sciences, Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)(stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts.").   When arbitration's applicability is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25). Cf. Presbyterian Healthcare Services v. Goldman, Sachs & Co., 112 F. Supp. 3d 1157, 1207 (D.N.M. 2015)(Browning, J.)(holding that "[n]o presumption towards arbitration exists" where the parties dispute the arbitration agreement's existence, not its scope).   New Mexico state courts

also view arbitration as a "highly favored" method of resolving disputes, "in part because '[i]t promotes both judicial efficiency and conservation of resources by all parties.'"   Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 5, 107 P.3d 11, 13 (alteration original).  See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

### 4.        A Valid Arbitration Agreement's Existence.

The Supreme Court of the United States of America has noted that "[a]rbitration is simply a matter of contract between parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration."   First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)(internal citations omitted).  Courts must interpret arbitration clauses liberally, and all doubts must be resolved in favor of arbitration.  See Hicks v. Cadle, Co., 355 F. App'x 186, 192 (10th Cir. 2009)("We resolve any doubts in favor of arbitrability.")(citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991)); Armijo v. Prudential Ins. Co., 72 F.3d 793, 797-98 (10th Cir. 1995)(stating that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and that "arbitration clauses must be interpreted liberally, and any doubts should be resolved in favor of arbitration," and holding that the plaintiffs had "failed to rebut the presumption of arbitrability.").

While "the presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the existence of a valid arbitration agreement."   Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002).  See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."); Presbyterian Healthcare Services v. Goldman, Sachs & Co., 112 F. Supp. at 1157.

In the Tenth Circuit, and in the courts of New Mexico, the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997).  See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 ("[T]he courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration.").   "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 68 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).  See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8-11.  Cf. K.L. House Construction Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (holding that, because a valid arbitration clause existed, the parties had to arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the subject matter of the contract").

### 5.   Consideration and Illusory Arbitration Agreements.

"To determine whether the agreement to arbitrate is valid, courts look to general state contract law, with the caveat that state laws that are specifically hostile to arbitration agreements are preempted by the FAA." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 (citations omitted).  "It is for the trial court, and not the arbitrator, to decide whether a valid agreement to arbitrate exists." Sisneros v. Citadel Broad. Co., 2006-NMCA-102, ¶ 13, 142 P.3d 34, 39.  It is a fundamental tenet of contract law "that each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." Ballard v. Chavez, 1994-NMSC-007, ¶ 8, 868 P.2d 646, 648.  Under New Mexico law, "[a] legally enforceable contract requires evidence supporting the existence of an offer, an acceptance, consideration, and

mutual assent." Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 6, 107 P.3d at 14 (internal quotation marks omitted).

"Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." Talbott v. Roswell Hosp. Corp., 2005-NMCA-109, ¶ 16, 118 P.3d 194, 198. "A valid contract must possess mutuality of obligation. Mutuality means both sides must provide consideration." Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d 495, 499. Absent evidence of a "bargained-for exchange between the parties," an agreement lacks consideration and is unenforceable. Smith v. Vill. of Ruidoso, 1999-NMCA-151, ¶ 33, 994 P.2d 50, 58. "Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469. "This principle applies equally to agreements to arbitrate." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469. The Supreme Court of New Mexico has concluded that, if a party "reserves the right to change the agreement unilaterally, and at any time," the party "has not really promised anything at all and should not be permitted to bind the other party." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.

Several cases arising in New Mexico provide examples of illusory agreements to arbitrate. For instance, in Dumais v. American Golf Corp., 150 F. Supp. 2d 1182, the United States District Court for the District of New Mexico was asked to determine if an arbitration provision contained in an employment handbook was enforceable, and precluded an employee from bringing a claim for sexual harassment and constructive discharge under Title VII, against her employer. See 150 F. Supp. 2d at 1193. The employer suggested that two documents which the employee executed when she became an employee constituted a valid agreement to arbitrate

such disputes.  See 150 F. Supp. 2d at 1193.  The documents included: (i) a form acknowledging that the employee had read and would abide by the employer's arbitration program -- the "We Can Work It Out" program; and (ii) an acknowledgment form that the employee would comply with the employment handbook and the "We Can Work It Out" program.  150 F. Supp. 2d at 1193.  The Honorable Martha Vazquez, United States District Judge for the District of New Mexico, concluded that the arbitration agreement embodied in the "We Can Work It Out" program was illusory, because it was executed over two months after the employee began her employment.  See 150 F. Supp. 2d at 1193.  The agreement also modified the employment terms -- it divested the employee's right to have disputes heard in an Article III court -- without consideration in return for that divestiture.  150 F. Supp. 2d at 1193.  Judge Vazquez noted that inconsistent provisions in the employment agreement made it unclear whether the arbitration agreement was binding on the employer, and therefore the potentially unilateral character of the promise to arbitrate made it illusory.  See 150 F. Supp. 2d at 1194.  The Tenth Circuit affirmed Judge Vazquez' holding in a de novo review on appeal.  See 299 F.3d at 1220.  In affirming Judge Vazquez, the Tenth Circuit stated: "We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."  299 F.3d at 1219.

Additionally, in Heye v. American Golf Corp., the Court of Appeals of New Mexico considered a question similar to the one that the federal court addressed in Dumais v. American Golf Corp.  See Heye v. American Golf Corp., 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500. The Court of Appeals of New Mexico assessed the validity of an arbitration agreement in an employment contract that bound the employee, but not the employer, to arbitrate and that the employee signed after she was hired.  See Heye v. American Golf Corp., 2003-NMCA-138,

- 27 -

¶¶ 10-15, 80 P.3d at 499-500.  In finding that the agreement was illusory, the Court of Appeals of New Mexico noted that the agreement permitted the employer to "amend, supplement, rescind or revise the policy regarding arbitration at its whim."  Heye v. American Golf Corporation, 2003-NMCA-138, ¶ 13, 80 P.3d at 499.  Although the employee was bound to arbitrate, the employer "remain[ed] free to selectively abide by its promise to arbitrate," and therefore the employer's "promise to arbitrate [did] not provide the consideration necessary to enforce the arbitration agreement."  Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 15, 80 P.3d at 500.

Next, in Piano v. Premier Distributing Co., the plaintiff worked as an administrative assistant for the defendant on an at-will employment basis.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13.  During her employment, the defendant presented the plaintiff with an arbitration agreement to sign, with the understanding that, if she did not sign it, the defendant would terminate her employment.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13.  The plaintiff signed the agreement, and, later, when her employment was terminated, she brought suit against the defendant for wrongful termination; the defendant moved to compel arbitration.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13.  On appeal of the district court's denial of the defendant's motion to compel arbitration, the Court of Appeals of New Mexico addressed whether an employer's promise of continued at-will employment constitutes sufficient consideration for an employee's promise to submit her claims to arbitration.  See Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶¶ 6-8, 107 P.3d at 14.  The Court of Appeals of New Mexico found that the employer's promise was illusory and explained: "The implied promise of continued at-will employment placed no constraints on Defendant's future conduct; its decision to continue Plaintiff's at-will employment

was entirely discretionary."   Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 8, 107 P.3d at 14.

In Lumuenemo v. Citigroup, Inc., No. 2009 WL 371901 (D. Colo. Feb. 12, 2009), the Honorable Wiley Y. Daniel, Chief United States District Judge for the District of Colorado, distinguished the facts in Piano v. Premier Distributing Co. from the facts in Lumuenemo v. Citigroup, Inc., stating:

> Plaintiff cites Piano v. Premier Distributing Co., 107 P.3d 11 (N.M. Ct. App. 2004), as support for her argument.  However, the holding in Piano turned on the fact that the plaintiff was an at-will employee prior to signing the arbitration agreement, and therefore, the implied promise of continued at-will employment did not constitute consideration. Id. at 60.  Piano is distinguishable from the facts before this Court.  Here, Defendant's initial hiring of Plaintiff was conditioned on her consent to the terms of the Arbitration Agreement; thus, there was consideration in the form of employment.  Further, Defendant does need Plaintiff's approval -- Plaintiff had up to 30 days to contest any changes to the Arbitration Agreement and/or to decide whether to continue employment based on such changes.  Moreover, the holding in Piano is not binding on this court.

Lumuenemo v. Citigroup, Inc., 2009 WL 371901, at *5.

Further, in Salazar v. Citadel Communications Corp., the Supreme Court of New Mexico held that, because Citadel Communications reserved the right to modify any provision of its employee handbook at any time, including the arbitration agreement contained therein, the agreement to arbitrate was "an unenforceable illusory promise."   Salazar v. Citadel Communications Corp., 2004-NMSC-013, ¶ 16, 90 P.3d at 471.   In contrast, the Court of Appeals of New Mexico in Sisneros v. Citadel Broadcasting Co. found that the arbitration policy at issue restricted Citadel Broadcasting's right to terminate or amend the agreement to arbitrate, and thus, when Citadel Broadcasting terminated Sisneros' employment, Citadel Broadcasting was bound to arbitrate the dispute, just as Sisneros was bound to arbitrate, and therefore mutual obligation existed and the arbitration agreement was not illusory.   See Sisneros v. Citadel

Broadcasting Co., 2006-NMCA-102, ¶ 34, 142 P.3d at 43.  Similarly, in Hardin v. First Cash

Fin. Servs., Inc., 465 F.3d 470 (10th Cir. 2006), the arbitration agreement required the employer

to provide ten-days' notice to its current employees before amending or terminating the

arbitration agreement, and provided that the employer could not amend the agreement if it had

actual notice of a potential dispute or claim, nor could it terminate the agreement as to any claims

which arose before the termination date.  See 465 F.3d at 478.  The Tenth Circuit, applying

Oklahoma contract law, concluded that "[t]he [ ] limitations [were] sufficient to avoid rendering

the parties' Agreement to arbitrate illusory."  Hardin v. First Cash Fin. Servs., Inc., 465 F.3d at

478.  See Pennington v. Northrop Grumman Space & Mission Sys. Corp., 269 F. App'x 812, 820

(10th Cir. 2008)(holding that "the reciprocal obligation to arbitrate provides the requisite

consideration."); Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting

parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190.  "The primary

objective in construing a contract is not to label it with specific definitions or to look at form

above substance, but to ascertain and enforce the intent of the parties as shown by the contents of

the instrument."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 925 P.2d at 1190 (citing

Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 619 P.2d 1226, 1229).  "The parol evidence rule 'bars

admission of evidence extrinsic to the contract to contradict and perhaps even supplement the

writing.'"  Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d 431,

437 (citation omitted).  If a contract is ambiguous, however, "evidence will be admitted to aid in

interpreting the parties' expressions."  C.R. Anthony Co. v. Loretto Mall Partners,

1991-NMSC-070, ¶ 12, 817 P.2d 238, 242 (citation omitted).  "On the other hand, if the court

determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible <u>to vary or modify its terms</u>."  <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991-NMSC-070, ¶ 12, 817 P.2d at 242 (emphasis in original)(citation omitted).

The question whether an agreement contains an ambiguity is a matter of law.  <u>See</u> <u>Mark V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 (citing <u>Levenson v. Mobley</u>, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176).  "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity."  <u>Mark V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citation omitted).  If, however, the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law."  <u>Mark V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.  If, however, the court concludes that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists."  <u>Mark V., Inc. v. Mellekas</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (citing <u>Vickers v. North Am. Land Dev., Inc.</u>, 1980-NMSC-021, ¶¶ 9-10, 607 P.2d 603, 606).  New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear."  <u>Mark V., Inc., v. Mellekas</u>, 1993-NMSC-001, ¶ 11, 845 P.2d at 1235.  <u>See id.</u>, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); <u>C.R. Anthony Co. v. Loretto Mall Partners</u>, 1991-NMSC-070, ¶ 15, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance.")(citation and footnote omitted).  Once the court

concludes that an ambiguity exists, the ambiguity's resolution becomes a question of fact.  See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1235.  To decide any ambiguous terms' meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."  Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 845 P.2d at 1236.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1184-85.

## LAW REGARDING NEW MEXICO'S UNCONSCIONABILITY DEFENSE TO CONTRACT ENFORCEMENT

In New Mexico, "unconscionability is an affirmative defense to contract enforcement . . . ."  Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 3, 304 P.3d 409, 412.  Consequently, "[c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are 'unreasonably favorable to one party while precluding a meaningful choice of the other party.'"  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 6, 385 P.3d 619, 621 (alteration added)(quoting Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 21,  208 P.3d 901, 907).

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

N.M. Stat. Ann. § 55-2-302(1).[3]  The party asserting an unconscionability defense "bears the burden of proving that a contract or a portion of a contract should be voided as unconscionable."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶¶ 24, 39, 48, 304 P.3d at

_____

[3]This provision relates to the sale of goods pursuant to New Mexico's  Uniform Commercial Code, N.M. Stat. Ann. § 55-2-101 et seq., i.e., not to Arbitration Agreements like the one at issue here.

415).  "The burden of proving unconscionability refers only to 'the burden of persuasion, i.e., the burden to persuade the factfinder' and not 'the burden of production, i.e., the burden to produce evidence.'"  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (quoting Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 24, 304 P.3d at 415).

"A contract can be procedurally or substantively unconscionable."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 21, 208 P.3d at 907).  See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d 1215, 1221 ("The classic articulation of unconscionability is that it is comprised of two prongs: substantive unconscionability and procedural unconscionability.")(citing 7 Joseph M. Perillo, Corbin on Contracts § 29.4, at 388 (2002 ed.)).  "Substantive unconscionability relates to the content of the contract terms and whether they are illegal, contrary to public policy, or grossly unfair."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14, 68 P.3d 901, 907; Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d 675, 679, disapproved of on other grounds by Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 31, 208 P.3d at 909).  "Procedural unconscionability," by contrast, "is determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an adhesive contract and the relative bargaining power of the parties."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).

"'The weight given to procedural and substantive considerations varies with the circumstances of each case.'"  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at

1221 (quoting Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).  "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all."  Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (citing Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 22, 188 P.3d at 1221 (invalidating an arbitration clause without a finding of procedural unconscionability where "there has been such an overwhelming showing of substantive unconscionability"); Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679; 7 Joseph M. Perillo, Corbin on Contracts § 29.1, at 377 (ed. 2002)(observing that there is "no basis in the text" of Article 2 of the Uniform Commercial Code for concluding that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable)).  Moreover, "[p]rocedural and substantive unconscionability often have an inverse relationship[.] The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable."  Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (alteration added)(citing Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1106 (9th Cir. 2003); 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.28, at 585 (3d ed. 2004)("A court will weigh all elements of both substantive and procedural unconscionability and may conclude that the contract is unconscionable because of the overall imbalance.")).

       1.      **Procedural Unconscionability.**

"Procedural unconscionability may be found where there was inequality in the contract formation."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d 658, 669 (citing Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08).  A contract is procedurally unconscionable "only where the inequality is so gross that one party's

choice is effectively non-existent." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709

P.2d at 679. See Bowlin's, Inc. v. Ramsey Oil Co., 1983-NMCA-038, ¶ 22, 662 P.2d 661, 669

(concluding that a contract may be unconscionable if there is "'an absence of meaningful choice

on the part of one of the parties'")(quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d

445, 449 (D.C. Cir. 1965)(Wright, J.). Whether a party has meaningful choice is "determined by

examining the circumstances surrounding the contract formation[], including the particular

party's ability to understand the terms of the contract and the relative bargaining power of the

parties." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679 (internal citations

omitted). Consequently, "[a]nalyzing procedural unconscionability requires the court to look

beyond the four corners of the contract and examine factors 'including the relative bargaining

strength, sophistication of the parties, and the extent to which either party felt free to accept or

decline terms demanded by the other.'" State ex rel. King v. B & B Inv. Grp., Inc., 2014-

NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova v. World Fin. Corp., 2009-NMSC-021, ¶

27, 208 P.3d at 907-08). See City of Raton v. Arkansas River Power Auth., 760 F. Supp. 2d

1132, 1154 (D.N.M. 2009)(Browning, J)("In analyzing whether a contract or a term in a contract

is procedurally unconscionable, New Mexico courts consider several factors, including the use of

high pressure tactics, the relative scarcity of the subject matter of the contract, and the relative

education, sophistication and wealth of the parties.")(citing Guthmann v. La Vida Llena, 1985-

NMSC-106, ¶ 16, 709 P.2d at 679).

"When assessing procedural unconscionability, courts should consider whether the

contract is one of adhesion." Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259

P.3d 803, 817. An adhesion contract is a standardized contract that a transacting party with

superior bargaining strength offers to a "weaker party on a take-it-or-leave-it basis, without

opportunity for bargaining." Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 33, 208 P.3d at 910). "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position." Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Wis. Auto Title Loans, Inc. v. Jones, 714 N.W.2d 155, 170 (Wis. 2006)). "Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.'" Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (quoting Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 33, 208 P.3d at 910).

For example, in State ex rel. King v. B & B Investment Group, Inc., the Supreme Court of New Mexico decided whether loan contracts offered by certain payday lenders were unconscionable. See 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70. The Supreme Court of New Mexico concluded that substantial evidence supported "the finding of procedural unconscionability as understood in common law." State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70. The Supreme Court of New Mexico predicated its holding that the loan contracts at issue were procedurally unconscionable on a number of facts regarding contract formation, including

> the relative bargaining strength and sophistication of the parties is unequal. Moreover, borrowers are presented with Hobson's choice: either accept the quadruple-digit interest rates, or walk away from the loan. The substantive terms are preprinted on a standard form, which is entirely nonnegotiable. The interest rates are set by drop-down menus in a computer program that precludes any modification of the offered rate. Employees are forbidden from manually overriding the computer to make fee adjustments without written permission from the companies' owners: manual overrides will be considered in violation of company policy and could result with . . . criminal charges brought against the employee and or termination.

State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (internal quotation marks omitted).  The Supreme Court of New Mexico further concluded that, on these facts, the payday loan contracts at issue were contracts of adhesion, because the "contracts are prepared entirely by Defendants, who have superior bargaining power, and are offered to the weaker party on a take-it-or-leave-it basis."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669.  The Supreme Court of New Mexico added that, "although they will not be found unconscionable in every case, an adhesion contract is procedurally unconscionable and unenforceable when the terms are patently unfair to the weaker party."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (citing Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817).

By contrast, in Bowlin's, Inc. v. Ramsey Oil Co., Inc., the Court of Appeals of New Mexico considered whether a clause requiring a retail gas company to notify its supplier of any delivery shortages within two days of taking delivery was unconscionable.  See 1983-NMCA-038, ¶ 23, 662 P.2d at 669.  The Court of Appeals of New Mexico addressed the party's understanding, the contract's sophistication, and the possibility of coercion, and concluded that, because the retailer fully understood the contract's term, and because "the contract was entered into between experienced and sophisticated business concerns," there was no reason to find unconscionability.  Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 23, 662 P.2d at 669 (internal quotation marks omitted).  The Court of Appeals of New Mexico also noted that unconscionability is more likely to sound as a defense where an individual consumer is concerned, explaining that "[t]he courts have not generally been receptive to pleas of unconscionability by one merchant against another."  Bowlin's, Inc. v. Ramsey Oil Co., Inc.,

1983-NMCA-038, ¶ 21, 662 P.2d at 669 (internal citation omitted).  See Thompson v. THI of

New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187, at *9-10.

In Carl Kelley Cons. LLC v. Danco Technologies, the Court determined that a contract

was not unconscionable under Texas or New Mexico law, because the contract's terms were

reasonably clear to the plaintiff:

> [The Plaintiff] never attempted to negotiate or object to any language in the
> contract. It is also a business, not an individual consumer, and is sophisticated
> enough to be hired to do work on a sewage treatment plant for a municipality and
> to intelligently select among competing options for materials to use in its work.
> This fact tends to reduce what disparity in sophistication and bargaining power
> might have existed between [the parties].  Moreover, such disparities alone are not
> enough to show unconscionability.  The terms of the contract take up only a
> single page, the contract is legible to the Court even with the degradation in print
> quality from being scanned into a .pdf file for the docket, the disclaimer of
> warranty includes several lines of disclaimer in all capital letters, and the terms
> are in relatively plain English, without any overly convoluted legal jargon or
> confusing syntax.  The provisions of the contract themselves are routine contract
> provisions. In these circumstances, the Court does not see a sound basis for
> finding the contract unconscionable.

Carl Kelley Const. LLC v. Danco Techs., 656 F. Supp. 2d 1323, 1342–43 (D.N.M. 2009)

(citations omitted).

### 2.    Substantive Unconscionability.

Substantive unconscionability requires courts "to consider 'whether the contract terms

are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of

the terms, and other similar public policy concerns" to determine "the legality and fairness of the

contract terms themselves.'"  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8,

385 P.3d at 621 (quoting Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 208 P.3d at 907).

Accordingly, when examining a contract for substantive unconscionability, courts must

"examine the terms on the face of the contract and to consider the practical consequences of

those terms."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621-

22 (citing <u>State ex rel. King v. B & B Inv. Grp., Inc.</u>, 2014-NMSC-024, ¶ 32, 329 P.3d at 670

("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")).

"Thus, the party bearing the burden of proving substantive unconscionability need not make any

particular evidentiary showing and can instead persuade the factfinder that the terms of a contract

are substantively unconscionable by analyzing the contract on its face." <u>Dalton v. Santander</u>

<u>Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 8, 385 P.3d at 622.

"When its terms are unreasonably favorable to one party, a contract may be held to be

substantively unconscionable." <u>Monette v. Tinsley</u>, 1999-NMCA-040, ¶ 19, 975 P.2d 361, 365

(citing <u>State ex rel. State Highway Transp. Dep't v. Garley</u>, 1991-NMSC-008, 806 P.2d 32, 39;

<u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, 709 P.2d at 680).  The Supreme Court of New

Mexico noted in <u>Guthmann v. La Vida Llena</u>:

> In determining reasonableness or fairness, the primary concern must be with the
> terms of the contract considered in light of the circumstances existing when the
> contract was made. The test is not simple, nor can it be mechanically applied. The
> terms are to be considered "in the light of the general commercial background and
> the commercial needs of the particular trade or case." Corbin suggests the test as
> being whether the terms are "so extreme as to appear unconscionable according to
> the mores and business practices of the time and place."

<u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶ 23, 709 P.2d at 680 (quoting <u>Bowlin's, Inc. v.</u>

<u>Ramsey Oil Co.</u>, 1983-NMCA-038, ¶ 22, 662 P.2d at 669 (quoting <u>Williams v. Walker-Thomas</u>

<u>Furniture Co.</u>, 350 F.2d at 450)).  Further, for a court to hold that a contract is substantively

unconscionable, the court must conclude that one or more of the contract's terms was grossly

unfair "at the time the contract was formed." <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶

24, 709 P.2d at 680.

With respect to arbitration agreements specifically, the Supreme Court of New Mexico

has held that arbitration agreements are substantively unconscionable and thus unenforceable

where the arbitration agreement contains a unilateral carve out that explicitly exempts from mandatory arbitration those judicial remedies that a lender is likely to need, while providing no such exemption for the borrower.   See Rivera v. American General Fin. Serv., Inc., 2011-NMSC-033, ¶¶ 51-54, 259 P.3d at 818-19; Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 32, 208 P.3d at 907-10.  In Cordova v. World Finance Corporation of New Mexico, for example, the Supreme Court of New Mexico stated that "[c]ontract provisions that unreasonably benefit one party over another are substantively unconscionable."  2009-NMSC-021, ¶ 25, 208 P.3d at 908. In that case, a loan contract included a purportedly bilateral arbitration clause containing a unilateral carve-out provision that exempted the lender from mandatory arbitration when the lender sought remedies, "including[,] but not limited to, judicial foreclosure or repossession" in the event of a default by the borrower.  Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 3, 208 P.3d at 904 (internal quotation marks omitted).  The Supreme Court of New Mexico held that the arbitration clause was "grossly unreasonable" and against New Mexico public policy, because the agreement required require the borrower to arbitrate any of the borrower's claims while reserving to the lender "the exclusive option of seeking its preferred remedies through litigation." 2009-NMSC-021, ¶ 20, 208 P.3d at 907.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was substantively unconscionable.  See 2009-NMSC-021, ¶ 32, 208 P.3d at 910.

Next, in Rivera v. American General Financial Services, Inc., the Supreme Court of New Mexico confronted a similar loan contract in which an arbitration agreement required the borrower to arbitrate any claims against the lender while exempting from mandatory arbitration the lender's "self-help or judicial remedies" concerning the property securing the transaction and any claims that the lender might have "[i]n the event of a default."  2011-NMSC-033, ¶ 3, 259

P.3d at 807-08.  As in <u>Cordova v. World Finance Corporation of New Mexico</u>, 2009-NMSC-021, ¶ 32, 208 P.3d at 910, in <u>Rivera v. American General Financial Services, Inc.</u>, the Supreme Court of New Mexico again held that an arbitration agreement is substantively unconscionable, because the arbitration clause allowed the lender to "retain[] the right to obtain through the judicial system the only remedies it [is] likely to need," while "forcing [the borrower] to arbitrate any claim she may have."  2011-NMSC-033, ¶ 53, 259 P.3d at 818-19.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was unreasonably one-sided and, therefore, unenforceable qua substantively unconscionable.  2011-NMSC-033, ¶ 54, 259 P.3d at 818-19.

By contrast, in <u>Dalton v. Santander Consumer USA, Inc.</u>, the Supreme Court of New Mexico held that an arbitration agreement between a lender and a borrower that included a bilateral exception for small claims less than $10,000.00 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . ."  2016-NMSC-035, ¶ 21, 385 P.3d at 624.  <u>See</u> <u>id.</u> ¶ 22, 385 P.3d at 625 ("We are hesitant to adopt a holding that might discourage bilateral small claims carve-outs, and thereby curtail the availability of small claims proceedings to New Mexico consumers . . . .").  The Supreme Court of New Mexico stated that "[g]ross unfairness is a bedrock principle of our unconscionability analysis," 2016-NMSC-035, ¶ 21; 385 P.3d at 624, and refused to conclude that an arbitration agreement that exempts, for both parties, claims less than $10,000.00 from mandatory arbitration is either unreasonably one-sided or grossly unfair, <u>see</u> 2016-NMSC-035, ¶¶ 21-25; 385 P.3d at 624-25. <u>See also</u> <u>Thompson v. THI of New Mexico at Casa Arena Blanca, LLC</u>, 2006 WL 4061187, at *10; <u>La Frontera Center, Inc. v. United Behavioral Health, Inc.</u>, No. CV 16-0187, 2017 WL 3172723, at *39 (D.N.M. June 1, 2017)(concluding that an arbitration agreement between a

healthcare provider and its subcontractor because its terms were bilateral -- i.e., binding both parties to arbitrate certain claims).

## ANALYSIS

The Court concludes that the parties have a valid Arbitration Agreement.  The Arbitration Agreement is not illusory, because both parties provided consideration, and it is not unconscionable, because Laurich was not deprived of meaningful choice.  Additionally, the Court concludes that whether Red Lobster breached the Arbitration Agreement in such a way that precludes it from enforcing the Arbitration Agreement is a question for the arbitrator and not for the Court.  Accordingly, the Court grants the Motion and will stay this proceeding pending the arbitration's resolution.

**I.    THE PARTIES HAVE A VALID ARBITRATION AGREEMENT, BECAUSE THE AGREEMENT IS NEITHER ILLUSORY NOR PROCEDURALLY UNCONSCIONABLE.**

Laurich asserts that the Arbitration Agreement is not enforceable, because it is illusory and procedurally unconscionable.  See Response at 1-3.  She argues that it is illusory, because Red Lobster did not provide consideration.  See Response at 1-3.  She also argues that it is procedurally unconscionable, because Red Lobster pressured her to enter the Arbitration Agreement during a work shift.  See Response 1-3.

To determine whether an Arbitration Agreement is valid, "courts look to general state contract law."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 (citations omitted).  The Court, and not an arbitrator, must decide whether an arbitration agreement is valid.  See Sisneros v. Citadel Broad. Co., 2006-NMCA-102, ¶ 13, 142 P.3d at 39.  Under New Mexico law, "[a] legally enforceable contract requires evidence supporting the existence of an offer, an acceptance, consideration, and mutual assent."  Piano v. Premier Distrib.

Co., 2005-NMCA-018, ¶ 6, 107 P.3d at 14 (internal quotation marks omitted).   Arbitration

agreements "may be invalidated by 'generally applicable contract defenses, such as fraud,

duress, or unconscionability.'"   Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 68 (quoting

Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).

The Court concludes that the Arbitration Agreement is not illusory, because Red Lobster

provided adequate consideration, and is not procedurally unconscionable, because Laurich was

given a reasonable opportunity to review the Arbitration Agreements' terms and was not

deprived of a meaningful choice.

## A. THE ARBITRATION AGREEMENT IS NOT ILLUSORY, BECAUSE THERE IS ADEQUATE CONSIDERATION.

The arbitration agreement is not illusory, because both Laurich and Red Lobster provided

consideration.   Under New Mexico law, a legally enforceable contract "requires evidence

supporting the existence of an offer, an acceptance, consideration, and mutual assent."   Piano v.

Premier Distrib. Co., 2005-NMCA-018, ¶ 6, 107 P.3d at 14 (internal quotation marks omitted).

Consideration is "a promise to do something that a party is under no legal obligation to do or to

forbear from doing something he has a legal right to do."   Talbott v. Roswell Hosp. Corp., 2005-

NMCA-109, ¶ 16, 118 P.3d 194, 198.   Both sides to a contract must provide consideration.   See

Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d 495, 499.   Here, Red Lobster asked

Laurich to agree to the DRP when or shortly after Red Lobster acquired the Red Lobster

restaurant chain.[4]   See Response ¶ 3, at 3.   Laurich understood that she could not work at Red

---

[4]Although neither party has provided precise dates for when Red Lobster acquired the
Restaurant Chain and when Laurich's manager asked her to agree to the DRP, the parties appear
in agreement that the request to sign the documents happened nearly contemporaneously or near
enough not to matter.   See Response ¶ 3, at 3 ("When that transition occurred, Ms. Laurich and
her coworkers were told that they were required to sign some new documents."); Reply at 2 ("As
a condition of her new employment by Defendant, [Laurich] was required to agree to the

Lobster if she did not sign the form.  See Response ¶ 5, at 3.  Consequently, by agreeing to the DRP, Laurich provided consideration by agreeing to arbitrate certain claims outside of the courtroom and to work at Red Lobster; Red Lobster provided consideration by also agreeing to arbitrate certain claims outside of the courtroom and to employ Laurich.  Neither Laurich nor Red Lobster was under any legal obligation to do any of those things.

Laurich argues that this case's facts are comparable to cases where a contract was determined to be illusory, but those comparisons are off base.  See Response at 4 (citing Dumas v. American Golf Corp., 150 F. Supp. 2d at 1193-94; Piano v. Premier Distributing Co., 2005-NMCA-018).  In Dumas v. American Golf Corp., the court concluded that an arbitration agreement signed a few months into the plaintiff's employment lacked consideration, because the plaintiff "was not given anything in return for signing away her rights."  150 F. Supp. 2d 1193-94.  The court also rejected the defendant AGC's argument that it effectively rehired the plaintiff when "it acquired Golf Enterprises," because the evidence showed that AGC and Golf Enterprises were "either the same entity . . . or her joint employers."  Dumais v. Am. Golf Corp., 150 F. Supp. 2d at 1187-88 (noting that both AGC and Gold Enterprises "used the same Santa Monica, California address," and used the same employee identification number for plaintiff's pay statements).  Here, by contrast, there is no indication that the ownership change that coincided with the 2014 Agreement was superficial.  Consequently, in this case, Laurich's received something in return for signing away her rights: employment under the new ownership regime.  For similar reasons, Piano v. Premier Distributing Co. does not help Laurich's position.  In Piano v. Premier Distributing Co., the Court of Appeals of New Mexico "rejected the employer's argument that continued at-will employment and the reciprocal promise to arbitrate

---

DRP . . . .  Otherwise Defendant would not have hired her and would have removed her from the work schedule.").

were sufficient consideration to sustain the agreement." Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187, at *7 (citing Piano v. Premier Distributing Co., 2005-NMCA-018, ¶ 8, 107 P.3d at 14).   Here, Red Lobster did not ask Laurich to enter the arbitration agreement out of the blue in exchange for continued at-will employment; rather, Red Lobster asked Laurich to enter the arbitration agreement as soon as Red Lobster became her employer.

## B.   THE   ARBITRATION   AGREEMENT   IS   NOT   PROCEDURALLY UNCONSCIONABLE, BECAUSE LAURICH WAS NOT DEPRIVED OF A MEANINGFUL CHOICE.

The 2014 Agreement was not procedurally unconscionable, because Laurich had the opportunity and capacity to understand the 2014 Agreement, and its terms were not patently unfair.   Under New Mexico law, unconscionability is an affirmative defense to contract enforcement, see Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 3, 304 P.3d at 412, and a contract may be unconscionable if the terms are unreasonably favorable to one party, and/or one party lacks a meaningful choice whether to enter the contract, see Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 6, 385 P.3d at 621.   To be unconscionable, a contract may be substantively and/or procedurally unconscionable.   See Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 24, 208 P.3d at 908.   Procedural unconscionability occurs when there is an "inequality" in the contract's formations such that "one party's choice is effectively non-existent." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679.   A court may consider factors relating to the circumstances surrounding contract formation, such as a party's ability to understand the contract terms, and the parties' relative bargaining power, see Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679, or the use of high pressure tactics, and the parties' relative sophistication, see City of Raton v. Arkansas River Power Auth.,

760 F. Supp. 2d at 1154. An adhesion contract -- where a weaker party is presented with a take-it-or-leave-it offer -- are not necessarily unconscionable, but may be unconscionable if the terms are "'patently unfair to the weaker party.'" Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (quoting Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 33, 208 P.3d at 910).

Here, Laurich's manager asked Laurich to read and agree to an arbitration agreement during a shift. See Response at 3. Laurich argues this is unconscionable, because: (i) she was pressured to sign it quickly, because the longer she took, the more time she would not be serving customers and earning tips; (ii) she was told that "she would be taken off the work schedule" if she did not sign; and (iii) she asked for a hard copy to read but was not given one. Response at 3. Although Laurich may have felt pressure to enter the agreement, these circumstances do not rise to the level of unconscionability, because they did not deprive her of a meaningful choice, and the terms were not patently unfair. The 2014 Agreement is not long, with the English language text taking up only half a page. See 2014 Agreement at 1. Laurich was familiar with an arbitration agreement's implications, because she had agreed to and worked under a similar arbitration agreement for six years before Red Lobster asked her to enter into a new one. See Tr. at 4:1-7 (Lamont). Furthermore, although the threat of being "taken off the work schedule" may represent a meaningful consequence, it is not permanent one; Laurich does not allege that Red Lobster threatened to fire her if she did not sign the agreement then and there. Finally, while it may have been in an adhesion contract in the sense that it was a take-it-or-leave-it offer, the terms are not so patently unfair that the agreement is unconscionable: the DRP binds both Laurich and Red Lobster, and Laurich will not have to pay the arbitration fees. See Tr. at 18:25 (Laurich).

## II.   ONLY AN ARBITRATOR MAY DETERMINE WHETHER RED LOBSTER BREACHED ITS DRP -- AND, IF SO, WHETHER THAT BREACH PRECLUDES IT FROM ENFORCING THE ARBITRATION AGREEMENT.

Laurich argues that Red Lobster may not enforce its DRP, because it already breached the DRP by not following the DRP's first step.  This question is one for the arbitrator, and not for the Court.   In the Tenth Circuit, a district court may determine substantive arbitrability questions -- e.g., whether the parties executed a valid arbitration agreement -- but only an arbitrator may consider whether one party's actions have relieved the other of its duty to perform -- i.e., whether a party has waived its right to enforce the arbitration agreement.   See Denhardt v. Trailways, Inc., 767 F.2d 687, 690 (10th Cir. 1985).  The Tenth Circuit wrote:

> Procedural arbitrability concerns such issues as "whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate." John Wiley & Sons v. Livingston, 376 U.S. 543, 557 . . . (1964). The Court held in Wiley that because procedural questions are often inextricably bound up with the merits of the dispute, they should also be decided by the arbitrator.

Denhardt v. Trailways, Inc., 767 F.2d 687, 690.  More recently, the Tenth Circuit clarified that a district court may, however, determine whether a party has lost the right to enforce an agreement because the party is in "default."   Pre-Paid Legal Servs., Inc. v. Cahill, 786 F.3d 1287, 1298 (10th Cir. 2015)(citing 9 U.S.C. § 3), cert. denied, 136 S. Ct. 373 (2015).  Although "default" in this context typically refers to a party's failure to pay required arbitration fees, the Tenth Circuit stated that a party can also default by "waiv[ing]" the right to arbitration by undertaking "inconsistent activity in another litigation forum."   Pre-Paid Legal Servs., Inc. v. Cahill, 786 F.3d at 1296 (citing Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 3 (1st Cir. 2005)).  The cases in other Courts of Appeals which the Tenth Circuit finds persuasive on this point, however, indicate that a district court should determine whether a party, by its litigation tactics, has waived

- 47 -

its right to enforce an arbitration clause because: (i) the district court is best positioned to determine whether litigation tactics indicate a waiver, and (ii) "the procedural waiver issue is not likely to be intertwined with the merits of the dispute."  Marie v. Allied Home Mortgage Corp., 402 F.3d at 4.

Here, Laurich's assertions that Red Lobster breached its DRP are procedural questions for an arbitrator, because those assertions implicate issues and actions unrelated to the Arbitration Agreement's formation.  Additionally, Laurich does not argue, and the pleadings do not suggest, that Red Lobster pursued a litigation strategy inconsistent with a desire to arbitrate. Red Lobster filed its Motion twenty days after Laurich filed her Complaint.  Red Lobster has not filed any motions on the merits in any way.  Consequently, Laurich's arguments that Red Lobster is precluded from enforcing the Arbitration Agreement, because Red Lobster failed to abide by DRP's first step, are concerns to be brought before an arbitrator, and not before the Court.[5]

-----

[5]Even if the Court could consider the question whether Red Lobster is precluded from enforcing the arbitration agreement, the Court does not believe, based on the allegations before it, that Red Lobster breached its DRP, and would still send the case to arbitration.  The DRP's Step One states: "If the Employee has a workplace concern or dispute, the Employee should bring it to the attention of the Employee's manager. . . . Open Door allows for an open and honest exchange by the people who are closest to the problem and often provides the best insight and opportunity for mutual resolution."  DRP at 4.  Another section describes the Open Door step as an "[i]nformal" way to "discuss and resolve concerns with management without retaliation."  DRP at 9.  Here, Laurich brought her concerns to her manager, and then submitted a written complaint, which the manager considered.  Red Lobster's response may not have been a model of constructive conflict resolution: Laurich states that she complained that Prather cursed at her, threatened her, called her names, threw a kitchen utensil at her, and then deliberately prepared Laurich's tables' orders incorrectly, see Written Complaint at 1-2, filed April 16, 2017 (Doc. 13-1);  Red Lobster stated that the General Manager responded by attempting, unsuccessfully, to substantiate Laurich's claims, and "remind[ing] the kitchen staff, including Willie Prather, of the importance of properly dressing plates," Hochsprung Decl. ¶¶ 9-10, at 2. In her declaration, Hochsprung contends that Laurich "never raised concerns about harassment to Red Lobster Restaurants, LLC," but that she merely "had a dispute regarding a loan to a co-worker and complaints about her customers' plates not being properly dressed with

III.    **THE ARBITRATION AGREEMENT COVERS LAURICH'S CLAIMS.**

Laurich's claims fall within the arbitration agreement's purview.  The DRP states:

> Examples of legal claims for relief covered by DRP (and step four -- Arbitration) include, but are not limited to: legal disputes arising out of or related to the employment relationship or the termination of that relationship (including post-employment defamation), compensation, classification, minimum wage, expense reimbursement, overtime, break and rest periods, claims that arise under the Civil Right Acts of 1964, Americans With Disabilities Act, Fair Labor Standards Act, Age Discrimination in Employment Act, Family Medical Leave Act, Employment Retirement Income Security Act of 1974 (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by ERISA or funded insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, unfair competition, violation of trade secrets, any common law right or duty, or any federal, state or local ordinance or statute.

DRP at 1.  Here, Laurich alleges that Red Lobster (i) violated Title VII of the Civil Rights Act of

1964; (ii) violated the New Mexico Human Rights Act; (iii) was negligent in hiring; and

(iv) wrongfully discharged her.   See Complaint, ¶¶ 37-76, at 5-8.   Those claims are "legal

disputes arising out of or related to the employment relationship or the termination of that

---

condiments."   Hochsprung Decl. ¶ 8, at 2.   This account is at odds with Laurich's written complaint -- which Red Lobster submitted along with the Hochsprung Decl. -- which begins by stating:

> Willie [Prather] yelled [and] cussed at me to "get the fuck out of his way" and said [that Laurich was] "a nasty [unintelligible] bitch."  So we got in an argument and he threw the scoop from the [unintelligible] at me. . . .   [T]he next day, I asked [Prather] to give me the [unintelligible] that I let him borrow the week before [and] he said "Fuck you and [your] 20 dollars, I ain't paying you shit, you snitched on me out to [unintelligible] and James, you are a bitch ass snitch, and you are going to get [what's] coming to you."  I was walking away and he followed me [unintelligible] hospitality yelling and cussing.

Written Complaint at 1.  Laurich then asserts that Prather deliberately messed up Laurich's customers' orders for four consecutive days.  See Written Complaint at 2.

Red Lobster's apparent failure to adequately resolve an issue does not, however, represent a breach, particularly in light of the subsequent steps that the DRP contemplates in the event that Step One is not satisfactory.  Additionally, the DRP does not indicate that each step must be followed before moving onto the next.  See DRP at 11-12 (stating that "[i]t is recommended that the steps . . . be followed in order," but not required).

relationship . . . .”  DRP at 1.  “[C]laims that arise under the Civil Right Acts of 1964” covers Laurich’s Title VII allegation.  DRP at 1.  “[V]iolation of . . . any common law right or duty, or any . . . state . . . statute” covers Laurich’s negligent hiring and wrongful termination claims and her New Mexico Human Rights Act claim.  DRP at 1.  All four of Laurich’s employment-related claims fit comfortably within the DRP’s scope, and they are not among the DRP’s “exceptions.”  DRP at 2 (listing exceptions to the DRP, which include workers compensation or unemployment insurance benefits).  Moreover, Laurich agrees that her claims fall within the DRP’s purview.  See Tr. at 26:4 (Bregman).

## IV.    THE COURT WILL STAY THE PROCEEDINGS.

The Court will stay this proceeding pending the arbitration’s resolution.  The FAA states that, once a court determines that the parties have a valid arbitration agreement and that the parties’ dispute falls within that arbitration agreement’s scope, the court “shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . .” 9 U.S.C. § 3.  Here, Red Lobster asked the Court to “compel the parties to arbitration, and stay this proceeding pending resolution of the arbitration.”  Motion at 1.  Having determined that the parties have a valid Arbitration Agreement, and that Laurich’s claims fall within the Arbitration Agreement’s scope, the Court will stay these proceedings.  See Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d at 955 (“[W]hen one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3’s mandatory language is binding, and it is error for the court to dismiss the action.”).

IT IS ORDERED that (i) the Defendant’s Motion to Compel Arbitration, filed March 2, 2017 (Doc. 5), is granted; and (ii) the Court stays this proceeding pending the arbitration’s resolution.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Sam Bregman
Bregman & Loman, P.C.
Albuquerque, New Mexico

      _Attorneys for the Plaintiff_

Charlotte A. Lamont
Littler Mendelson, P.C.
Albuquerque, New Mexico

      _Attorneys for the Defendant_